# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GREGORY JOSEPH NEIFERT,** | : | Civil No. 1:20-CV-453 |
| **Plaintiff** | : | |
| v. | : | |
| | : | (Magistrate Judge Carlson) |
| **ANDREW SAUL,** | : | |
| **Commissioner of Social Security,** | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

**I.    Statement of Facts and of the Case**

On February 19, 2016, Gregory Neifert applied for disability insurance benefits pursuant to Title II of the Social Security Act, claiming that he had become disabled in December of 2012 due to a severe traumatic brain injury suffered in a fall. (Tr. 18). With respect to this disability claim based upon a brain injury, in May of 2016 the state agency expert psychiatrist, Dr. Roger Fretz, confirmed a diagnosis of a severe cerebral trauma but concluded that there was insufficient evidence for him to assess Neifert's ability to maintain concentration, persistence and pace, conduct activities of daily living, or engage in social functioning. (Tr. 102). Thus, beyond confirming that Neifert had, in fact, suffered from a severe traumatic brain

injury, the state agency expert could not opine on his ability to perform these essential work-related spheres of mental functioning.

A hearing was scheduled on Neifert's disability application on November 5, 2018. When he appeared for a Social Security disability hearing, Gregory Neifert presented a difficult dilemma for the Administrative Law Judge (ALJ). Neifert's disability claim rested upon the assertion that he was severely mentally impaired as a result of a significant traumatic brain injury he had suffered in December of 2012. While it was undisputed that Neifert suffered from some degree of mental impairment due to this traumatic brain injury, Neifert appeared unaided by counsel at his disability hearing. Recognizing that Neifert suffered from mental impairments, the ALJ engaged in a colloquy with Neifert regarding his right to representation and assistance of counsel in an attempt to confirm a knowing and intelligent waiver of counsel by the plaintiff. (Tr. 39-54). Despite this conscientious effort by the ALJ, the colloquy with Neifert left more questions than answers concerning whether this mentally-impaired claimant was making a knowing and intelligent decide to forego the assistance of counsel.

Neifert's own limitations stymied efforts by the ALJ to ascertain whether he fully understood and agreed to waive the assistance of counsel. Thus, while Neifert expressed a desire to proceed to this hearing without legal representation, (Tr. 54),

many of the statements made by Neifert cast doubt upon whether this was an informed decision by this mentally-impaired disability claimant. For example, Neifert was confused when the ALJ mentioned his right to a representative, asking "what does a representative do?" (Tr. 41). That confusion seemed to persist for Neifert as he suggested that his brother could play this role or he might consider securing a representative after the hearing in the event of an unfavorable outcome. (Tr. 44-45, 47-48). As noted by the ALJ, neither of these suggestions by Neifert was an appropriate substitute for the assistance of counsel at the hearing itself. Neifert also provided an explanation for his reluctance to seek assistance of counsel, which indicated that his decision to forego obtaining counsel was uninformed and was based on considerations that were unrelated to his actual need for legal support in this proceeding, stating that previously "I went through—six years of the legal system that turned out real bad." (Tr. 47).

When the ALJ explained that his representative could compile medical information concerning Neifert's impairments as of this date last insured, June 2016, Neifert's confusion deepened and he stated: " I'm, I'm not understanding about the insurance part on June '16." (Tr. 42). Thus, Neifert did not clearly comprehend what a representative could do on his behalf at this hearing. Nor did he understand that he had an obligation to establish that he was disabled as of his date last insured. When

3

the importance of proving disability as of his date last insured was explained to Neifert, he then confessed that "I probably can't remember June '16." (Tr. 54). Neifert's inability to recall his mental state as of his date last insured, by itself, strongly suggested that this claimant needed assistance in presenting this claim. Neifert also acknowledged that he had no understanding regarding what medical evidence was in the administrative record relating to his disability claim. Specifically, when asked if he had had an opportunity to review the CD containing this medical evidence, Neifert stated "[t]hat was a problem in itself for me" and explained that he was unable to figure out how to access the contents of the CD. (Tr. 50).

It was against this backdrop that Neifert—a mentally impaired, uninformed, somewhat confused and factually unprepared claimant—elected to proceed to a hearing without the benefit of counsel. The conduct of the hearing itself cast further doubt upon Neifert's decision to proceed without the assistance of counsel. In response to questioning by the ALJ, Neifert repeatedly stated that he could not recall crucial facts and lamented that he feared that he would forget to raise important points. (Tr. 55-68). Beyond his shortcomings as a witness, Neifert played no active role at the hearing. He asked no questions of the witnesses and did not challenge the testimony of the vocational expert, who stated that Neifert could perform several

types of jobs that required Reasoning Level 3 skills. (Tr. 78). Specifically, the vocational expert testified that a person with Neifert's mental impairments could work as a pricer or a mail clerk. (Id.) As defined by the Dictionary of Occupational Titles, both of the jobs called for level 3 reasoning skills.  See 209.687-026 MAIL CLERK, DICOT 209.687-026; 214.467-014 PRICER, MESSAGE AND DELIVERY SERVICE, DICOT 214.467-014. Under the Commissioner's regulations, Reasoning Level 3 entails the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and] [d]eal with problems involving several concrete variables in or from standardized situations." DICOT, APPENDIX C - COMPONENTS OF THE DEFINITION TRAILER, 1991 WL 688702. This was a degree of cognitive skill that was not readily apparent on Neifert's part, given his presentation at this hearing.

Instead, the only evidence Neifert presented was a July 7, 2016 report from a Dr. William Freese. (Tr. 1550-60). Neifert submitted this report to the ALJ without any factual context or explanation, which may have led to ALJ to misunderstand what this report represented. In the decision denying Neifert's application for benefits, the ALJ later described Dr. Freese as "the claimant's treating neurologist." (Tr. 29). However, this characterization seems incorrect since the report itself appears to be a report of a retained expert who was conducting an independent

medical examination on behalf of counsel for some party who was involved in litigation against Neifert. (Tr. 1550). The report is addressed to an attorney, explained that Dr. Freese, the author, was conducting an independent medical examination for counsel, and noted the presence of Neifert's attorney at the examination. Taken together, this information clearly suggested that Dr. Freese had been retained by counsel for a party other than Neifert to examine the plaintiff. Thus, instead of being a report by Neifert's treating neurologist, as stated by the ALJ, it appears that the report the plaintiff submitted was actually a report prepared by a retained expert to defend against some legal claim previously made by Neifert.

Following this hearing, on January 3, 2019, the ALJ issued a decision denying Neifert's disability claim. (Tr. 15-32). In this decision, the ALJ first concluded that Neifert met the Act's insured status requirements through June 2016, and had not engaged in substantial gainful activity between December 2012, when he suffered this head injury, and June 2016. (Tr. 21). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Neifert's traumatic head injury was a severe impairment. (Tr. 21). At Step 3 the ALJ determined that Neifert's mental limitations did not meet or medically equal the severity of one of the listed impairments. (Tr. 22-24).

The ALJ then arrived at a residual functional capacity (RFC) assessment for Neifert, which found that he had no exertional limitations but was limited to simple, routine tasks, performed at a non-production rate pace, with simple work-related decisions, and only occasional contact with supervisors, co-workers and the public. (Tr. 24). In reaching this RFC determination, the ALJ afforded little weight to the opinion of the state agency expert, Dr. Roger Fretz, which concluded that there was insufficient data to determine Neifert's work-related limitations. (Tr. 29). Instead, the ALJ concluded that the existing records allowed him to arrive at an informed RFC assessment. However, in reaching this conclusion, the ALJ gave "significant weight" to the medical opinion of Dr. William Freese, a physician that the ALJ described as Neifert's "treating neurologist". (Tr. 29).

While the haphazard way in which Mr. Neifert presented this report to the ALJ at this hearing may have created the impression that Dr. Freese was a treating source, the report itself is far less clear on that score. Quite the contrary, it appears that the report reflects the results of an independent medical examination conducted by Dr. Freese at the request of an attorney who was representing some party whose interest may have been adverse to Neifert's. Thus, it appears that Neifert's unrepresented status may have resulted in this evidence being presented in a confused and confusing fashion. Nonetheless operating upon this suspect premise,

and rejecting the view of the agency expert that there was insufficient evidence to opine on Neifert's functional limitations, the ALJ fashioned this RFC for the plaintiff.

Having arrived at this residual functional capacity (RFC) assessment, the ALJ then found at Step 5 that Neifert could perform work in the national economy, and denied his disability claim. (Tr. 30-31). Notably, among the jobs identified by the ALJ that Neifert could potentially perform were two positions, mail clerk and pricer, that are defined in the Dictionary of Occupational Titles as jobs which require Reasoning Level 3. Jobs rated at Reasoning Level 3 require the intellectual ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and] [d]eal with problems involving several concrete variables in or from standardized situations." DICOT, APPENDIX C - COMPONENTS OF THE DEFINITION TRAILER, 1991 WL 688702. This reasoning level rests at the mid-point of the 6-level reasoning component employed by the Dictionary of Occupational Titles. Given Neifert's impairments, it is not clear how the ALJ reconciled these Reasoning Level 3 positions with Neifert's mental limitations or the simple tasks RFC that the ALJ fashioned in this case. Because Neifert was unschooled in the subtleties of Social Security practice, he made no effort to challenge this aspect of the ALJ's decision.

Having initially proceeded *pro se*, on appeal Neifert has secured counsel and this counseled appeal followed. (Doc. 1.) On appeal, Neifert's counsel argues that the ALJ erred in allowing the plaintiff to proceed uncounseled, and that error prejudiced Neifert in the presentation of this case. This case is fully briefed and is therefore ripe for resolution. For the reasons set forth below, we agree that these flawed proceedings prejudiced Neifert in ways that compel a remand of this case. Therefore, we will remand this case for further proceedings.

**II.   Discussion**

**A. A Remand is Necessary in this Case.**

The outcome of this appeal turns on our consideration of two pivotal and closely interrelated questions. First, did Neifert waive his right to counsel in a knowing and intelligent fashion? Second, did Neifert suffer any clear prejudice as a result of the decision to proceed to a hearing without the aid of counsel?

The legal benchmarks that govern waiver of counsel and the duties of an ALJ when dealing with an unrepresented claimant are familiar and well-settled. In this setting:

> Though a claimant does not have a constitutional right to counsel at a social security disability hearing, she does have a statutory and regulatory right to counsel at such a hearing. 42 U.S.C. § 406; 20 C.F.R. § 404.1705. The claimant must be given notice of the right to counsel and can waive this right only by a knowing and intelligent waiver. See, e.g., Smith v. Schweiker, 677 F.2d 826, 828 (11th Cir.1982). Moreover,

> where a claimant is *pro se*, the ALJ has a duty to help the claimant develop the administrative record and "must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir.2003) (internal quotations omitted).Although an ALJ may deny a *pro se* claimant benefits, it is appropriate for a reviewing court to remand a case if there is "a showing of clear prejudice or unfairness at the administrative hearing." Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir.1979); see also Livingston v. Califano, 614 F.2d 342, 345 (3d Cir.1980) ("[I]f it is clear that the lack of counsel prejudiced the claimant or that the administrative proceeding was marked by unfairness due to the lack of counsel, this is sufficient for remand, or reversal."). A determination of whether the claimant waived the right to counsel knowingly and intelligently determines who has the burden of demonstrating whether remand is appropriate. As the Court of Appeals for the Seventh Circuit has explained, "[i]f the ALJ does not obtain a valid waiver of counsel, the burden is on the Commissioner to show the ALJ adequately developed the record." Skinner v. Astrue, 478 F.3d 836, 842 (7th Cir.2007).

Vivaritas v. Comm'r of Soc. Sec., 264 F. App'x 155, 157–58 (3d Cir. 2008).

Thus, the threshold question we must address is whether Neifert waived his right to counsel in a knowing and intelligent manner. "Unlike other circuits, the Third Circuit has not clearly defined a standard for what an ALJ must do to obtain a 'knowing and intelligent' waiver of a *pro se* claimant's right to counsel." Velez v. Comm'r of Soc. Sec., No. CV 17-02914 (RBK), 2018 WL 6787538, at *2 (D.N.J. Dec. 26, 2018). Thus following Vivaritas, courts in this circuit have "declin[ed] to adopt a 'rigid' approach that an ALJ must follow to obtain a valid waiver." Id. at *3 (collecting cases). However, there has been one consistent theme through these

10

cases, which rests upon the fact that many Social Security disability claimants, like Neifert, suffer from mental impairments. Recognizing that these mental impairments may limit the ability of individual claimants to understand and knowingly waive their right to counsel, courts have repeatedly acknowledged that what might otherwise appear to have been an adequate colloquy may be insufficient to establish waiver by a mentally impaired disability claimant. See e.g., Vivaritas v. Comm'r of Soc. Sec., 264 F. App'x 155, 161 (3d Cir. 2008); Parker v. Berryhill, No. CV 16-271, 2017 WL 1022579, at *3 (W.D. Pa. Mar. 16, 2017); George v. Comm'r of Soc. Sec., No. CIV.A. 13-5179 FLW, 2014 WL 3955071, at *3 (D.N.J. Aug. 13, 2014).

So it is in this case. While the ALJ engaged in a conscientious colloquy with Neifert, in our view the results of that colloquy demonstrated that Neifert's mental impairments did not allow him to make a knowing and intelligent decision to forego his right to counsel. Quite the contrary, that colloquy underscores how Neifert's decision to waive counsel was not made in a knowing and intelligent fashion. From the outset, Neifert displayed a profound lack of understanding regarding the important rights which he was surrendering. Thus, when the ALJ mentioned Neifert's right to a representative, he replied: "what does a representative do?" (Tr. 41). When the ALJ explained that his representative could compile medical information concerning Neifert's impairments as of this date last insured, June 2016,

Neifert's confusion deepened and he stated: " I'm, I'm not understanding about the insurance part on June '16." (Tr. 42). The shortcomings in this waiver of counsel by Neifert were then cast in sharp relief when the importance of proving disability as of his date last insured was explained to him. At this juncture, Neifert confessed that "I probably can't remember June '16." (Tr. 54). Neifert also acknowledged that he had no understanding regarding what medical evidence was in the administrative record relating to his disability claim, since when asked if he had had an opportunity to review the CD containing this medical evidence, Neifert stated "[t]hat was a problem in itself for me" and explained that he was unable to figure out how to access the contents of the CD. (Tr. 50).

Simply put, at this hearing Neifert presented as a claimant who did not understand the role of counsel; who was unaware of the importance of proving disability on his date last insured; who was unable to recall his mental status on his date last insured; and who was completely uninformed regarding the medical evidence under consideration by the ALJ. Given this constellation of considerations, all of which weigh against a valid waiver of counsel, we conclude that Neifert's waiver of his right to the assistance of counsel was not a knowing and intelligent waiver as required by law.

Having concluded that Neifert did not knowingly waive his right to counsel, we turn to the second question we must consider; namely, whether Neifert suffered any clear prejudice as a result of his decision to proceed to a hearing without counsel. On this score, having found that there was no valid waiver of counsel in this case, the Commissioner bears the burden of showing that the ALJ adequately developed the record in this case. Vivaritas, 264 F. App'x at 158. In this regard, it is well-settled that:

> When a *pro se* claimant waives his or her right to counsel, the ALJ presiding over the claimant's hearing has a heightened duty to help develop the record that goes beyond the base "duty to investigate the facts and develop the arguments both for and against granting benefits." Sims v. Apfel, 530 U.S. 103, 120, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). The ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir.2003) (quoting Key v. Heckler, 754 F.2d 1545, 1551 9th Cir.1985)). The *pro se* claimant may be prejudiced by the ALJ's failure to observe this heightened duty. Dobrowolsky, 606 F.2d at 407. Thus, "if it is clear that the lack of counsel prejudiced the claimant or that the administrative proceeding was marked by unfairness due to the lack of counsel, this is sufficient for remand, or reversal." Livingston, 614 F.3d at 345; see also Kummer, 2013 WL 5467067 at *3 ("The court may find a proceeding unfair where the ALJ does not develop a complete record and the essential inquiry is whether 'the incomplete record reveals evidentiary gaps which result in prejudice to the claimant.' " (quoting Gauthnney v. Shalala, 890 F.Supp. 401, 410 (E.D.Pa.1995))).

George v. Comm'r of Soc. Sec., No. CIV.A. 13-5179 FLW, 2014 WL 3955071, at *4 (D.N.J. Aug. 13, 2014).

13

In this case, we find that the Commissioner has not carried its burden of proving that the administrative record was adequately developed for this confused and mentally impaired *pro se* claimant. Instead, we conclude that there is "a showing of clear prejudice or unfairness at the administrative hearing" that stemmed from Neifert's unrepresented status and requires a remand of this case. Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979). Indeed, in our view, Neifert suffered at least four forms of direct prejudice in this case.

First, we find that the ALJ failed to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" in this case. Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). In particular, the ALJ failed to give adequate consideration to the opinion of the state agency expert, Dr. Roger Fretz, that there was insufficient data to determine Neifert's work-related limitations. This opinion from the state agency expert was unusual and strongly suggested a need to further develop the administrative record prior to rendering a decision in this case, yet that agency expert opinion was given scant weight and consideration. In short, given Dr. Fretz's statement regarding the insufficiency of the medical evidence, the ALJ's duty to scrupulously and conscientiously probe into all the relevant facts called for further development of the medical record, perhaps through a consultative examination.

Second, we conclude that the ALJ's treatment of the evidence also did not sufficiently take into account the profound limitations on Neifert's ability to present his own case. The record reveals that Neifert did not understand the role of counsel at a disability hearing; did not appreciate the elements of proof which he was required to meet to establish his claim; did not recall his mental state as of his date last insured; and was unable to read, much less comprehend, the medical evidence in the record. Given these facts, the ALJ had a particularly exacting duty to ensure that the medical record was fully developed since it was evident that Neifert was wholly unable to take on this task on his own.

Third, it appears that Neifert's uninformed and haphazard presentation of his case actually may have confused and misled the ALJ in at least one material respect. As we have noted, the only evidence presented by Neifert at this hearing was a report from Dr. William Freese, a physician that the ALJ described as Neifert's "treating neurologist." (Tr. 29). The ALJ gave significant weight to this report in rejecting Neifert's claim. Yet, while this characterization of Dr. Freese by the ALJ is perhaps understandable since Neifert offered this evidence at the hearing, it does not appear to be entirely accurate. Quite the contrary, far from being a treating source, as suggested by the ALJ, it appears that this report reflected the results of an independent medical examination conducted by Dr. Freese at the request of an

15

attorney who was representing some party whose interest was adverse to Neifert's. This profound, and unanswered, confusion regarding the provenance of Dr. Freese's report is particularly significant, given the weight given to that report by the ALJ based upon what may be an erroneous assumption that the doctor was a treating source. In order to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, some greater clarity is needed here. In the absence of such clarity, Neifert suffered demonstrable prejudice

Finally, there is a latent, but potentially material, conflict between the ALJ's RFC determination, which limited Neifert to simple, routine tasks, and the Vocational Expert testimony, which identified several jobs that required Reasoning Level 3 as positions that Neifert could perform. While "there is no bright-line rule stating whether there is a *per se* conflict between a job that requires level 3 reasoning and a finding that a claimant should be limited to simple and routine work," Zirnsak v. Colvin, 777 F.3d 607, 618 (3d Cir. 2014), case law holds that the failure to reconcile such apparent inconsistencies can be prejudicial if there is a showing that the claimant cannot meet the demands of jobs that require level 3 reasoning skills. Id. Given Neifert's mental impairments, there is a substantial question concerning whether he could perform level 3 reasoning tasks. Moreover, in light of Neifert's mental limitations, the plaintiff could not be expected to identify, much less develop,

this issue. Therefore, it was incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore this potential discrepancy, something that did not take place in this case.

Yet, while case law calls for a remand and further proceedings by the ALJ in this case, nothing in our Memorandum Opinion should be construed as suggesting what the outcome of that final and full analysis should be. Rather, that final assessment of the evidence must await a thorough consideration and development of this evidence on remand by an ALJ. Therefore, nothing in this Memorandum Opinion should be deemed as expressing a view on what the ultimate outcome of any reassessment of this evidence should be. Rather, that task should remain the duty and province of the ALJ on remand.

## III. Conclusion

For the foregoing reasons, the decision of the Commissioner in this case will be REVERSED and this case will be REMANDED for further consideration by the Commissioner. An appropriate order follows.

Submitted this 10th day of November 2020.

*/S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge